**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SOLOCRON MEDIA, LLC, | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-1059-JRG-RSP |
| | § | |
| VERIZON COMMUNICATIONS INC., | § | |
| et al. | § | |
| | § | |

## <u>CLAIM CONSTRUCTION</u>
## <u>MEMORANDUM AND ORDER</u>

On January 9, 2015, the Court held a hearing to determine the proper construction of the

disputed claim terms in United States Patents No. 6,496,692, 7,257,395, 7,295,864, 7,319,866,

7,742,759, and 8,594,651.  After considering the arguments made by the parties at the hearing

and in the parties' claim construction briefing (Dkt. Nos. 119, 131, and 138),[1] the Court issues

this Claim Construction Memorandum and Order.

---

[1] Citations to documents (such as the parties' briefs and exhibits) in this Claim Construction Memorandum and Order refer to the page numbers of the original documents rather than the page numbers assigned by the Court's electronic docket unless otherwise indicated.

<h1 style="text-align:center">Table of Contents</h1>

**BACKGROUND** ....................................................................................................... **3**

**LEGAL PRINCIPLES** ............................................................................................. **3**

**THE PARTIES' STIPULATED TERMS** ................................................................. **6**

**DISPUTED TERMS THAT APPEAR IN MULTIPLE PATENTS** ......................... **7**

    A. "video file," "the video file," and "the selected video file" ................................. 7

    B. "communications link" ....................................................................................... 12

    C. "polyphonic," "polyphonic audio file," and "polyphonic sound" ....................... 15

    D. "configured to [perform some function]" ........................................................... 21

**DISPUTED TERMS IN U.S. PATENT NO. 7,742,759** ........................................ **25**

    A. "allow a user to download the video file" .......................................................... 25

    B. "convert the video file to a native playback format usable by a playback device" ........... 28

    C. "native playback format" .................................................................................... 33

**DISPUTED TERM IN U.S. PATENT NO. 8,594,651** ......................................... **38**

    A. "link that identifies the converted file" ............................................................. 38

**DISPUTED TERMS IN U.S. PATENT NO. 6,496,692** ....................................... **41**

    A. "user-defined audio file" ..................................................................................... 41

    B. "A method for programming a user defined audio file into a telephone" ........... 45

**TERMS THAT DEFENDANTS CONTEND ARE INDEFINITE** ........................... **48**

    A. "enhanced performance speaker" and "enhanced performance speaker capable of providing a substantially full range of audio sounds" ....................................... 48

    B. "substantially full range of audio sounds" ......................................................... 52

    C. "allowing," "to allow," and "that allows" .......................................................... 56

    D. "enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication" .......... 59

**CONCLUSION** ...................................................................................................... **62**

**APPENDIX A** ........................................................................................................ **63**

# BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 6,496,692 ("the '692 Patent"), 7,257,395 ("the '395 Patent"), 7,295,864 ("the '864 Patent"), 7,319,866 ("the '866 Patent"), 7,742,759 ("the '759 Patent"), and 8,594,651 ("the '651 Patent") (collectively, the "patents-in-suit"). In general, Plaintiff submits the patents-in-suit relate to cell phone ringtones and to the converting of audio or video files sent to a cell phone. Dkt. No. 119 at 1. The Abstracts of the patents-in-suit are the same and state:

> A device for programming user-defined information into an electronic device is provided. The programmer allows a user to program customized information, such as user-selected audio, video, or Internet access information into his or her programmable device. Such electronic devices include wireless telephones, pagers, and personal digital assistants. The programmer allows a user to, among other things, customize the device to suit his or her particular taste.

Plaintiff submits: "The Asserted Patents share a common specification. The parties have agreed to cite only the 692 Patent when addressing the specification of any of the 'ringtone' patents (692, 395, 864, and 866 Patents) and to cite only the 651 Patent when addressing the specification of either of the 'messaging' patents (651 and 759 Patents)." Dkt. No. 119 at 1 n.1.

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with preliminary constructions for the disputed terms with the aim of focusing the parties' arguments and facilitating discussion as to those terms. Those preliminary constructions are set forth below within the discussion for each term.

# LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start

by considering the intrinsic evidence.  *See id.* at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id.*  Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id.* Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d

at 1316.  In these situations, the inventor's lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining

the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has recently "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.

## THE PARTIES' STIPULATED TERMS

The parties have reached agreement on constructions for certain terms, as stated in their Joint Claim Construction and Prehearing Statement (Dkt. No. 115 at App'x 1) and their Joint Claim Construction Chart (Dkt. No. 142). Of particular note, Plaintiff's opening brief presented "the native playback format" in Claim 56 of the '759 Patent as a disputed term, but the parties subsequently reached an agreed-upon construction for this term, as reflected in the parties' Joint Claim Construction Chart. *See* Dkt. No. 142, Ex. A at 3. The parties' agreements are set forth in Appendix A to this Claim Construction Memorandum and Order.

## DISPUTED TERMS THAT APPEAR IN MULTIPLE PATENTS

**A. "video file," "the video file," and "the selected video file"**

| "video file" and "the video file" | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning. If construction is necessary, then: "a file including a video clip or image" | "file with a visual presentation that is capable of showing motion or movement" |

| "the selected video file" | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning. If construction is necessary, then: "a file including a video clip or image that has been selected" | "file with a visual presentation that is capable of showing motion or movement that has been selected" |

Dkt. No. 142, Ex. A at 4. The parties submit that these terms appear in Claims 1, 10, 12, 16, 17, 21, 23, and 31-33 of the '651 Patent and Claims 53, 56, 64, and 65 of the '759 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with its preliminary construction that "video file" and "the video file" mean "a file including a video clip or image" and, as to "the selected video file," "[n]o construction necessary apart from construction of 'video file' and 'the video file,' above."

(1) The Parties' Positions

Plaintiff argues that Defendants' proposal of requiring motion should be rejected because the specification identifies the "JPEG" static image format as an example of a video file. Dkt. No. 119 at 4 (citing '651 Patent at 4:4-7; citing Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 31).

Defendants argue that the claims and the prosecution history of parent United States Patent No. 7,555,317 ("the '317 Patent") distinguish between a "video file" and an "image file." Dkt. No. 131 at 2. Defendants also submit that "[e]very extrinsic source cited by both parties distinguishes 'video' files, which are capable of showing motion, from 'image' or picture files, which cannot show motion." *Id.* at 2. Defendants also cite handwritten notes of the named inventor, dated in 1999, that refer to "video/image" and "video or image files." *Id.* at 4 (citing Ex. J (SCRN00004875, SCRN00004877 & SCRN00004881)). Further, Defendants note, "[w]hile the provisional application to which the '759 claims priority stated that '[e]xamples of video may include . . . digital pictures' (Ex. I, at 1), the actual patent application (filed in March 2000) dropped the 'digital pictures' statement—an omission consistent with the representations to the PTO [(Patent and Trademark Office)] that 'image file' is different from 'video file.'" Dkt. No. 131 at 3.

Defendants also argue that Plaintiff's reliance on disclosure regarding "JPEG" is unavailing because "it was well known as of the asserted priority date that 'JPEG' included files that were capable of showing movement." *Id.* at 5 (citing, *e.g.*, *id.*, Ex. O, United States Patent No. 6,091,778 (referring to "motion JPEG video streams")).

Plaintiff replies that "Defendants offer no basis to reconcile their insistence that a file must be 'capable of showing motion' with the unmistakable statements in [dependent] claims that it need not." Dkt. No. 138 at 1. Plaintiff also urges that "contrary to Defendants' arguments, a JPEG file is a static image." *Id.* Plaintiff submits that "motion JPEG" is known as "MJPEG," not JPEG. *Id.* at 2 (citing, *e.g.*, Dkt. No. 131, Ex. P, United States Patent No. 6,211,869 at 12:49-51 ("350 is a . . . computer that stores and delivers high quality audio and motion JPEG video (MJPEG)")).

At the January 9, 2015 hearing, Defendants also highlighted claims that recite "video playing capability," arguing that "playing" is only relevant in the context of motion video.

(2) Analysis

As a threshold matter, Defendants have cited the Court's construction of the term "video" in an unrelated matter. *See Personalized Media Commc'n LLC v. Zynga, Inc.*, No. 2:12-CV-68, 2013 WL 4630447, slip op. at 11-14 (E.D. Tex. Aug. 28, 2013) (Payne, J.) (attached to Defendants' response brief as Exhibit A). Because that case involved an unrelated patent, the Court's construction in that case is of minimal, if any, probative value as to the present patents-in-suit. Defendants' citation of another district court's construction of "video" in an unrelated patent is similarly unavailing. *See* Dkt. No. 131 at 4-5 (citing *Civix-DDI, LLC v. Hotels.com, L.P.*, No. 05-CV-07879, 2010 WL 438675, at *18 (N.D. Ill. Oct. 25, 2010)).

As Plaintiff has noted, Claim 5 of the '651 Patent recites that "the selected video file is a JPEG file," and Claims 7 and 18 of the '651 Patent recite that "the selected video file includes a single image frame." Defendants respond that "[w]hile claim 7 states the video file 'includes a single image frame,' that video 'frame' is still taken from a series of video frames; it is distinct from a static picture that is not part of a full motion video." Dkt. No. 131 at 5 (citation and internal quotation marks omitted).

On balance, Plaintiff has the better reading of these dependent claims, which thus weigh against requiring a "video file" to be capable of showing motion or movement. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."); *see also* '651 Patent at 8:49-51 (describing "a video file containing a video clip *or frame*") (emphasis added).

Further, the recital of "video playing *capability*," highlighted by Defendants, is not inconsistent with the term "video" encompassing both motion video and still images.

As for the remainder of the specification, the written description discloses, for example, "choosing a video file" so that "the person receiving the call is alerted by seeing or hearing the video clip and/or associated audio." *Id.* at 8:52-54. The specification thus appears to contrast "video" with audio rather than with a picture or image.

The specification also uses the term "video" in the context of still images:

> Programmer 30 may also communicate with device 20 to determine which format the incoming information should be converted to so that the information is compatible with the downloading requirements of device 20. For audio files, this may include, but is not limited to, converting to or from any of the following format types: analog; MIDI; MPEG; PCM; Windows Media Audio Code (WMA); WAV; or Adaptive Transform Acoustic Coding (ATRAC), or to or from any other suitable audio format, etc. For *video files*, this may include, but is not limited to, converting to or from any of the following format types: *analog; JPEG; MPEG; GIF; AVI*, or to or from any other suitable video format, etc.

*Id.* at 3:63-4:7 (emphasis added); *see id.* at 1:44-45 ("[C]ertain types of user-defined *video* information, such as video clips, *frames*, and other digital or analog *images . . . .*") (emphasis added). Plaintiff's expert, Dr. William Henry Mangione-Smith, opines that "JPEG is a standard computer file format denoted by the file extension '.jpg' for storing graphic images in a compressed form for general use. JPEG images are static images, compressed using a mathematical algorithm." Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 31 (citations omitted).

Defendants have cited the parent '317 Patent, which is related to the '651 Patent through several continuation applications. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-15 (Fed. Cir. 2007) (finding the prosecution history of the parent application having a specification with "the same content" to be "relevant in construing the claims" of related patents). Claims 5,

28, 37, 50, 59, and 67 of the '317 Patent recite "wherein the signature file [is / includes] an image file or a video file," thus evidently distinguishing between "video" and "image." Also, during prosecution of the parent '317 Patent, the examiner searched for "image or video." *See* Dkt. No. 131, Ex. G at Oct. 1, 2008 WEST Search History for Application 11/633142. The '317 Patent and its prosecution history thus suggest that "image" and "video" are distinct. Defendants have not presented any authority, however, for their proposition that an examiner's search history should inform the construction of claim terms.

Even assuming for the sake of argument that these parent application claims and the examiner search history are probative here, the '651 Patent and the '759 Patent claim priority to a provisional application that stated: "[e]xamples of *video* may include video clips *or digital pictures* stored in a wireless telephone or a PDA, etc." Dkt. No. 138, Ex. 22, Dec. 6, 1999 Provisional Application No. 60/169,158 at 1 (SCRN00011848). In addition to the priority claim, the '651 Patent expressly incorporates this provisional application by reference. '651 Patent at 1:22-24. The provisional application should thus be considered. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed. Cir. 2014) (noting that the district court's construction was inconsistent with the provisional application incorporated by reference into the patent specification).

The parties have cited various extrinsic dictionary definitions of "video" (*see* Dkt. No. 131, Exs. K-M), but ultimately those definitions do not outweigh the above-cited intrinsic references to "JPEG" and "digital pictures." *See* Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 31 (quoted above).

Finally, Defendants have cited *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1289-90 (Fed. Cir. 2009) for the proposition that claims in a later application cannot be

construed to cover material that appeared in a priority application but not in the later application. *Abbott* is distinguishable, however, because the court in *Abbott* also found a "clear and intentional disavowal," which has not been established in the present case.

Based on the foregoing, Defendants' proposal that "video" must be "capable of showing motion or movement" is hereby expressly rejected.

The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"video file" and "the video file"** | **"a file including a video clip or image"** |
| **"the selected video file"** | **No construction necessary apart from construction of "video file" and "the video file," above.** |

**B. "communications link"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>    "a connection that enables data transfer" | "a hard-wired link, e.g., a serial port, parallel port, universal serial bus (USB), RS 232, or GPIB" |

Dkt. No. 142, Ex. A at 6. The parties submit that this term appears in Claims 14, 22, 30, and 39 of the '395 Patent, Claim 10 of '866 Patent, and Claim 12 of the '651 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "communications link": "Plain meaning (Expressly reject Defendants' proposal of a 'hard-wired' link)."

(1) The Parties' Positions

Plaintiff argues that "Defendants' attempt to limit this term to 'a hard-wired link' is contrary to the claim language, the specification, and the understanding of one of ordinary skill in the art." Dkt. No. 119 at 5.

Defendants respond that "[t]he specification . . . explains that the genus 'link' includes at least five species: (1) 'communications links;' (2) 'modems;' (3) 'a network interface link;' (4) 'wireless communications links;' and (5) any other type of link." Dkt. No. 131 at 6 (citing '651 Patent at 3:33-41). Defendants also submit that "most cell phones (from the time of the invention to today) are capable of connecting to a computer via a hard-wired USB port to upload or download data." Dkt. No. 131 at 7.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 138.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

(2) Analysis

Claim 12 of the '651 Patent recites conversion of a file sent "from a first wireless communications device . . . to a second wireless communications device . . . ."

The specification discloses:

In FIG. 1, links 31 and 32 may be, for example, *communications links* (*e.g.*, serial ports, parallel ports, universal serial buses (USB), RS232, GPIB, etc.), modems (e.g., any suitable analog or digital modems, cellular modems, or cable modems), a network interface link (e.g., Ethernet links, token ring links, etc.), *wireless communications links* (e.g., cellular telephone links, wireless Internet links, infrared links, etc.), or any other suitable *hard-wired or wireless Internet or communications links*.

* * *

As shown in FIG. 3, computer 60 may be connected to Internet 80 through link 70. *Link 70* may be, for example, a modem (e.g., any suitable analog or

digital modem, cellular modem, or cable modem), a network interface link (e.g., an Ethernet link, token ring link, etc.), a *wireless communications link* (e.g., a wireless telephone link, a wireless Internet link, an infrared link, etc.), or any other suitable *hard-wired or wireless communications link*.

'651 Patent at 3:33-41 & 5:39-46 (emphasis added).

In operation, computer 90 may communicate with device 20 to determine its format requirements and perform any conversions necessary to make user-selected information compatible with those requirements. This allows a user to select information, such as audio and/or video, that is available on the Internet or on a remote network computer, and program that information into device 20. This may be accomplished via *communications link 33* (which may be any type of link previously described as suitable for link 32). For example, a user may wish to download video images from an Internet site to a hand-held computer, such as a PDA, or to a wireless telephone. The user may communicate with computer 90 via a *wireless link 33* and select information from Internet 80 using an Internet browser installed in device 20.

'651 Patent at 6:30-43 (emphasis added).

On balance, the "serial port, parallel port, universal serial bus (USB), RS 232, or GPIB" proposed by Defendants are examples that should not be imported into the claims. *See Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324, 1330 (Fed. Cir. 2013) (noting "the use of 'e.g.,' rather than 'i.e.'"); *see also Comark*, 156 F.3d at 1187 ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."). Further, these above-quoted disclosures of a "hard-wired or wireless" link reinforce that a "communications link" may be wired or wireless.

As for extrinsic evidence, Plaintiff has cited a technical dictionary definition of "communications link" as meaning: "The connection between computers that enables data transfer." Dkt. No. 119, Ex. 7, *Microsoft Press Computer Dictionary* 83 (2d ed. 1994) (SCRN00010877). Plaintiff has also cited a technical dictionary definition of "link" as meaning "the connection between two systems" or "[t]o interconnect items of data or portions of one or

more computer programs." *Id.*, Ex. 8, *IBM Dictionary of Computing* 386-87 (1994) (SCRN00010866-67). This evidence is consistent with finding that a "communications link" is not limited to a wired connection.

Defendants' proposed construction is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"communications link"** to have its **plain meaning**.

### C. "polyphonic," "polyphonic audio file," and "polyphonic sound"

| "polyphonic" | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning. If construction is necessary, then:<br>    "having more than one sound" | (No separate construction required) |

| **"polyphonic audio file"** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning. If construction is necessary, then:<br>    "audio file having more than one sound" | "a synthesized representation of an audio composition having more than one sound" |

| **"polyphonic sound"** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain meaning. If construction is necessary, then:<br>    "audio having more than one sound" | "a synthesized representation of audio having more than one sound" |

Dkt. No. 142, Ex. A at 5. The parties submit that these terms appear in Claims 39 and 40 of the '395 Patent, Claims 11-14, 16, 17, and 19 of the '864 Patent, and Claim 10 of the '866 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with its preliminary construction that "polyphonic" means "having more than one sound" and, as to "polyphonic audio file" and "polyphonic sound," "[n]o construction necessary apart from construction of the term 'polyphonic,' as set forth above."

(1) The Parties' Positions

Plaintiff argues that "Defendants improperly seek to narrow these terms to mean 'synthesized' sounds such as 'MIDI' audio files in contradiction of the intrinsic evidence. The dependent claims, specification, and prosecution history evince a clear intention that the terms not be limited to synthesized representations of audio sounds." Dkt. No. 119 at 7.

Defendants respond that their proposal "preserves the differences between" the three well-known categories of ringtones: "(1) 'monophonic ringtones' (synthesized representations of

audio files capable of playing only one note); (2) 'polyphonic ringtones' (synthesized representations of audio files capable of playing multiple sounds); and (3) 'mastertones' (actual recording of music files)." Dkt. No. 131 at 8. Defendants urge that this ordinary meaning must apply because "the specification contains no mention of the term 'polyphonic' or the concept of a polyphonic ringtone, and the applicant did not act as his own lexicographer." *Id.* Also, Defendants argue, "Defendants' proposed construction correctly focuses on the *content* of an audio file, not its encoding *format.*" *Id.* at 9.

As for the prosecution history, Defendants respond that the patentee did not clearly redefine the term "polyphonic," particularly in light of the patentee's use of the word "sometimes" (as quoted below) *Id.* at 11. Defendants also cite extrinsic evidence in support of their argument that a polyphonic ringtone is, by definition, synthesized. *Id.* at 9-10.

Plaintiff replies that "Defendants' arguments regarding the differences between various types of ringtones (Dkt. 131 at 8) rely on sources that post-date the specification." Dkt. No. 138 at 5. Moreover, Plaintiff argues, the disclosure in the specification trumps any extrinsic evidence. *See id.* at 5-6. Plaintiff also argues that the opinions of Defendants' expert should be disregarded because Defendants' expert, having degrees in music and computer music composition, is not a person of ordinary skill in the relevant arts of electrical engineering or computer science. *See id.*

At the January 9, 2015 hearing, Defendants urged that the prosecution history relied upon by Plaintiff sets forth gratuitous statements by the patentee intended to ensnare ringtone technology developments that arose long after the priority date. Defendants also reiterated their argument that "polyphonic" has had a widely-accepted meaning at all relevant times. *See Bayer*

*Cropscience*, 728 F.3d at 1330 (finding a failure to overcome the "strong accepted scientific meaning" of claim language).

Plaintiff responded that no authority supports Defendants' speculation regarding the intent underlying the patentee's statements during prosecution. Further, Plaintiff responded, Defendants' reliance on extrinsic evidence of a purportedly widely-accepted meaning is improper and must fail in light of the prosecution history, which includes at least one relevant statement as far back as 2003. *See* Dkt. No. 119, Ex. 9, Jul. 8, 2003 Preliminary Amendment III ('395 Patent File History) at 3 (SCRN00001858) (p. 36 of 36 of Ex. 9) (quoted below). Finally, Plaintiff emphasized that whereas Defendants have addressed the purportedly widely-accepted meaning of "polyphonic ringtone," the disputed terms do not recite "ringtone."

Defendants replied that the context set forth in the claims and the specification is ringtones.

(2) Analysis

On one hand, departure from the ordinary meaning of a term generally requires that the patentee "clearly" set forth a definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[T]he claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and *clearly* set forth a definition of the disputed claim term in either the specification or prosecution history.") (emphasis added); *see Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (citation and internal quotation marks omitted).

On the other hand, Claims 7 and 27 of the '864 Patent recite: "wherein the database is configured to include polyphonic audio files selected from the group comprising MP3, MPEG,

or WAV files." Similarly, the specification discloses that audio files can include WAV and MP3 files. *See* '692 Patent at 3:49-54 & 4:21-24. Plaintiff has submitted the opinion of its expert that such files can contain "digitized versions of analog sounds" rather than synthesized sounds. Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 34; *see id.* at ¶¶ 32-34.

As for the prosecution history, the patentee stated that "MP3, WAV, MPEG, and many MIDI files are polyphonic audio files." Dkt. No. 119, Ex. 9, Jul. 8, 2003 Preliminary Amendment III ('395 Patent File History) at 3 (SCRN00001858) (p. 36 of 36 of Ex. 9). The patentee also stated that "the use of high fidelity ringtones such as polyphonic ringtones (sometimes referred to now as 'real tones,' 'true tones,' 'master tones,' etc.) that may be actual MP3 (or other high quality digital representations of) songs or other audio greatly improves the user's experience by allowing the user to hear realistic recreations of selected audio." *Id.*, Ex. 10, May 4, 2007 Reply to Office Action ('866 Patent File History) at 17-18 (SCRN00002611-12); *see id.*, Ex. 9, Mar. 18, 2007 Reply to Office Action ('395 Patent File History) at 24-25 (SCRN00002257-58) (similar).

Defendants have submitted various pieces of extrinsic evidence in support of their argument that the term "polyphonic" refers to synthesized sounds rather than sound recordings. *See* Dkt. No. 131 at 9-10 (citing *id.* at Exs. S-V); *see, e.g., id.*, Ex. S, U.S. Copyright Office, No. RF 2006-1, Memorandum Opinion at 6 & 8 (Oct. 16, 2006); *id.*, Ex. V, Al Kohn and Bob Kohn, *Kohn on Music Licensing* 730 (4th ed. 2010); *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("When the intrinsic evidence is silent as to the plain meaning of a term, it is entirely appropriate for the district court to look to dictionaries or other extrinsic sources for context—to aid in arriving at the plain meaning of a claim term.").

Nonetheless, the specification provides no connection between the term "polyphonic" and the synthesizing of sounds. Indeed, the word "synthesize" does not appear in the specification at all.

Defendants have also cited the declaration of their expert, Dr. Curtis Roads. In particular, at the January 9, 2015 hearing, Defendants emphasized the declaration of Dr. Roads as being among Defendants' best evidence in support of their proposed constructions for the "polyphonic" terms. The only paragraph cited by Defendants in this regard declares as follows:

> Audio files encoded in these file formats [(MP3 and WAV)] can be likened to an envelope holding a letter: the encoding format is the envelope and the audio content is the letter. In the case of MP3 and WAV files, the envelope (file format) is agnostic as to the audio content of the file. Any type of sound can be encoded in an MP3 or WAV files [sic], be it a monophonic ringtone, a polyphonic ringtone, a mastertone, a synthesizer performance, or the sound of a barking dog. Merely encoding a sound in MP3 or WAV format does not convey whether or not that encoded sound was synthesized.

Dkt. No. 132, Dec. 11, 2014 Roads Decl. at ¶ 14. Dr. Roads thus did not opine that the term "polyphonic" means "synthesized." On the contrary, Plaintiff demonstrated at the January 9, 2015 hearing that Dr. Roads has authored a book, *The Computer Music Tutorial* (1996), in which he used the term "polyphonic" in the context of recorded sound rather than synthesized sound.

On balance, because the above-discussed intrinsic evidence is inconsistent with Defendants' position, and because Defendants' emphasis on extrinsic evidence is disfavored and unpersuasive, Defendants' proposed constructions are hereby expressly rejected. *See generally Phillips*, 415 F.3d 1303.

The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"polyphonic"** | **"having more than one sound"** |
| **"polyphonic audio file"** | **No construction necessary apart from construction of the term "polyphonic," as set forth above.** |
| **"polyphonic sound"** | **No construction necessary apart from construction of the term "polyphonic," as set forth above.** |

**D. "configured to [perform some function]"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning | "specifically designed and set up to perform the claimed function"[2] |

Dkt. No. 142, Ex. A at 6. The parties submit that this term appears in Claims 12 and 31 of the '651 Patent, Claim 10 of the '866 Patent, and Claims 22 and 30 of the '395 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "configured to [perform some function]": "Plain meaning (Expressly reject Defendants' proposal of 'specifically design[ing] and set[ting] up')."

(1) The Parties' Positions

Plaintiff submits that "[c]ourts in multiple districts, including the Eastern District of Texas, have found the term 'configured to' to have its plain meaning or have construed it to mean 'capable of' or words to that effect." Dkt. No. 119 at 9 (citing, *e.g.*, *Ciena Corp. v. Nortel Networks, Inc., et al.*, No. 2:05-CV-14, 2006 WL 1133798, at *13 (E.D. Tex. Apr. 25, 2006)

---

[2] In the parties' P.R. 4-3 Joint Claim Construction and Prehearing Statement, Defendants proposed: "Requires actual performance of action associated with the 'configured' clause, as opposed to mere capability." Dkt. No. 115, App'x 1 at 44. Defendants' response brief presented the construction that Defendants presently propose, explaining: "Defendants have modified their construction of this term to better address the parties' dispute." Dkt. No. 131 at 11 n.3.

(Davis, J.) ("configured to supply service channel optical signals" construed as "programmed to supply service channel optical signals")). Plaintiff concludes that "'[c]onfigured to' is a common phrase that is understandable by both skilled artisans and lay jury members alike, and does not need construction." Dkt. No. 119 at 10.

Defendants respond that "[g]overning law confirms that 'configured to' requires more than 'capability;' it requires specific efforts to design and set up an element to act in a certain way." Dkt. No. 131 at 11. Defendants also argue that Claims 22 and 30 of the '395 Patent recite both "configured to" and "capable of," thereby reinforcing that the patents-in-suit use those terms to have different meanings. *Id.* at 13.

Plaintiff replies that "Defendants' inclusion of a subjective [design] intent limitation should be rejected" and that "Defendants' attempt to add 'set up to perform the claimed function' to the meaning of 'configured to' raises more questions than it answers and is likely to confuse the jury." Dkt. No. 138 at 7. Plaintiff also argues that "Defendants rely on inapposite cases construing the term 'adapted to'—not 'configured to.'" *Id.* Plaintiff concludes that "'[c]onfigured to' is an ordinary phrase and does not need construction." *Id.* at 8.

At the January 9, 2015 hearing, Plaintiff argued that although "configured to" requires, for example, appropriate programming, the term does not require actually performing any function. Also, Defendants argued that their proposed construction does not introduce any specific intent requirement.

(2) Analysis

Claim 12 of the '651 Patent recites, in relevant part (emphasis added): "a first communications link *configured to* receive from a first wireless communications device a video

file selected by a user of the first wireless communications device for transmission to a second wireless communications device having video playing capability."

On one hand, the specification uses the phrase "capable of" as well as the phrase "configured to" without any apparent distinction between the two:

> For example, device 20 may be a PDA *capable of* making wireless telephone calls, a PDA with paging functions, a wireless telephone with some PDA or paging functions, a handheld or notebook computer with some or all of the functions of a PDA, a pager, and a telephone, etc.
>
> * * *
>
> Programmer 30 may be *configured to* receive and process both analog and digital signals.
>
> * * *
>
> It will be understood, however, that in this implementation, at least a portion of computer 90 is *configured to* function as programmer 30, and that computer 90 may continue to perform other functions such as communicating with network computers 82, communicating with Internet 80, interfacing with external telephone network 84, and coordinating wireless Internet and telephone access etc., in addition to performing some or all of the above-described programming functions.

'692 Patent at 3:10-15, 4:8-9 & 6:7-15 (emphasis added). "[I]t is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).

On the other hand, some claims use the phrase "capable of" as well as the phrase "configured to," for example Claim 10 of the '866 Patent (emphasis added):

> 10. A telephone that may be customized by searching for and selecting an audio file from a remote computer and programming the selected audio file into the telephone for use as an indicia of an incoming communication, the telephone comprising:
>
> a communications link *capable of* connecting to a database in the remote computer that includes a plurality of polyphonic audio files;

a display screen and a browsing application program that allows a user of the telephone to browse the polyphonic audio files and select at least one polyphonic audio file therefrom;

processing circuitry *configured to* supervise receipt of a selected polyphonic audio file from the communications link;

a programmable memory circuit for allowing the user to optionally store the selected polyphonic audio file for use as an indicia of an incoming communication; and

an enhanced performance speaker *capable of* providing a substantially full range of audio sounds from the selected polyphonic audio file when the selected polyphonic audio file is played.

"In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings." *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Further, Defendants have cited cases finding that "configured to" has a narrower meaning than "capable of." *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (in construing "adapted to," adopting the "narrower definition" of "configured to" instead of the "broader sense" of "capable of"); *see also SIPCO, LLC v. ABB, Inc.*, No. 6:11-CV-48, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012) (Love, J.) ("[T]he claims mandate that the devices are 'configured to' perform particular functions. Interpreting 'configured to' as requiring only mere capability would eliminate any meaningful limits to the claims. Accordingly, the Court finds that 'configured to' means 'actually programmed or equipped with hardware or software to.'").

On balance, although the Court agrees with Defendants that mere capability is insufficient (as set forth below), Defendants' proposal would tend to confuse rather than clarify the scope of the claims, for example by suggesting that the intent of a designer must be established. The Court therefore hereby expressly rejects Defendants' proposal of "specifically designed and set up to perform the claimed function."

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"configured to"** to have its **plain meaning**, "which the Court understands to require not merely being capable of being configured but rather being actually configured." *SIPCO v. Amazon.com, Inc., et al.*, No. 2:08-CV-359, Dkt. No. 562, 2012 WL 5195942, slip op. at 91 (E.D. Tex. Oct. 19, 2012) (Gilstrap, J.).

## DISPUTED TERMS IN U.S. PATENT NO. 7,742,759

### A. "allow a user to download the video file"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain meaning. If construction is necessary, then:<br>    "permit a user to download the video file" | "allow a user to download the received and unconverted video file" |

Dkt. No. 142, Ex. A at 5. The parties submit that this term appears in Claim 53 of the '759 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "allow a user to download the video file": "Plain meaning (Expressly reject Defendants' proposal of requiring downloading of an 'unconverted video file')."

### (1) The Parties' Positions

Plaintiff submits that "[t]he parties dispute whether 'the video file' within the term 'allow a user to download the video file' refers to the unconverted video file that is originally received or the subsequently converted video file." Dkt. No. 119 at 10. Plaintiff argues that "[i]f the playback device were not meant to download the converted file, there would be no reason to convert the file to a format usable by it." *Id.* at 11. Plaintiff concludes: "In light of the intrinsic

record, it would not make any sense to read claim 53 as Defendants suggest, that is, as requiring the programmable memory to go through the steps of converting a file, only to then not download that converted file, but instead download the original unconverted file. Defendants' attempt to use a drafting technicality to trump language that is clearly understandable by persons of ordinary skill in the art should be rejected." *Id.* at 12.

Defendants respond that "[Plaintiff's] construction ignores the antecedent basis for 'the video file' and renders the claims indefinite." Dkt. No. 131 at 13. Defendants also emphasize that "claim 53 recites converting 'the video file' to a format compatible with 'a' playback device, but then recites allowing the user to download 'the video file' to '*a* [i.e., any] playback device'— not '*the* playback device.' In other words, there is no requirement that the playback device in the third limitation be the same playback device in the second limitation." *Id.* at 15 (square brackets in original).

Plaintiff replies, in full, as follows: "[Plaintiff's] construction does not 'ignore' antecedent basis, *contra* Dkt. 131 at 13, rather it accounts for the term's plain meaning in light of the claim and specification. *See Mangosoft IP, Inc. v. Skype Techs. SA*, 2:06-cv-390, 2008 U.S. Dist. LEXIS 62281 [(2008 WL 3852740)], at *14-17 (E.D. Tex. Aug. 14, 2008) (rejecting antecedent basis argument in light of embodiments contrary to that reading)." Dkt. No. 138 at 8.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

(2)  Analysis

The specification discloses that if information is compatible with a device, the information can be downloaded by the device without performing any conversion. *See* '651 Patent at 2:19-30, 3:47-54 ("Programmer 30 may then process this information into a suitable

format (or may simply route the information if no format conversion is required), and program it into a programmable memory within device 20 (not shown).")*, 4:45-58, 10:59-11:10, 11:55-60, Fig. 10 (steps 160, 162 & 164) & Fig. 11 (steps 170, 172 & 174).

The specification also discloses that a file can be converted and then provided to a device:

> Programmer 30 may also communicate with device 20 to determine which format the incoming information should be converted to so that the information is compatible with the downloading requirements of device 20.

*Id.* at 3:63-66; *see id.* at 4:47-49 ("For example, some or all of the input signals received from source 50 may require further processing to meet the downloading specifications of device 20.").

> In another embodiment, a remote computer or Internet site may perform a format conversion of information requested by computer 90 or device 20. For example, a user may access an Internet site or remote computer using communications network 95 and enter a title or description of the desired audio or video information along with format requirements. The remote computer or Internet site may then search the Internet or other databases to find a file that matches the user's description. Once this file is found, the Internet site or remote computer may *convert that file to the requested format*, (using a system similar to the [*sic*, that] described above) *and provide it to device 20* via computer 90 and/or link 33.

*Id.* at 7:13-24 (emphasis added); *see id.* at Figs. 8 & 9 (illustrating steps for converting and editing followed by "[p]rovid[ing] user with the option of programming edited file into device").

Claim 53 of the '759 Patent recites (emphasis added):

> 53. A programmable memory having stored thereon a plurality of sequences of instructions including sequences of instructions which, when executed by one or more processors cause one or more electronic devices to:
> > *receive a video file* in a native playback format;
> > *convert the video file* to a native playback format usable by a playback device; and
> > *allow a user to download the video file* to a playback device for subsequent use at a time specified by the user.

On one hand, use of the definite article, "the," as in "the video file," generally refers back to an instance where the same phrase is introduced with the indefinite article, "a." *See Baldwin*

*Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (discussing "the use of a definite article ('said' or 'the') to refer back to an initial indefinite article"). Defendants conclude that "the video file" that is downloaded must therefore be "a video file" as received, prior to any conversion of the video file. *See* Dkt. No. 131 at 13.

On balance, the better reading is that Claim 53 refers to the "video file" as the same "video file" even if it has been converted to a different format. Defendants' proposal to the contrary is therefore hereby expressly rejected.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"allow a user to download the video file"** to have its **plain meaning**.

**B. "convert the video file to a native playback format usable by a playback device"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br><br>"convert the video file to a native playback format usable by a playback device" | "convert the video file from a native playback format that is not usable by the playback device to a native playback format that is usable by the playback device" |

Dkt. No. 142, Ex. A at 5 (square brackets omitted). The parties submit that this term appears in Claim 53 of the '759 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "convert the video file to a native playback format usable by a playback device": "Plain meaning (Expressly reject Defendants' proposal of requiring a video file that is 'not usable by the playback device')."

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[a]part from the phrase 'native playback format,' which is the subject of a separately briefed claim construction dispute, the remaining language of this term ('convert the video file,' 'usable by a playback device') consists of everyday English words that are readily understandable by a jury without further construction."  Dkt. No. 119 at 12.  Plaintiff urges that Defendants' additional "not usable" limitation should be rejected as unsupported.  *Id.* at 13.  Plaintiff concludes that "[t]he limitation is . . . result-oriented, and focused on the output of the conversion step and its suitability for the playback device, not its inputs."  *Id.*

Defendants respond: "Defendants' construction recognizes what the applicant allegedly invented—a system that examines whether the native playback format of a video file is compatible with the native playback format of a playback device, and, *if not*, converting that file to a compatible native playback format."  Dkt. No. 131 at 15-16.  Defendants urge that "nowhere does the specification disclose conversion from one usable format to another usable format."  *Id.* at 17.  Defendants also cite prosecution history (discussed below).  *Id.* at 17-18.

Plaintiff's reply brief does not address this term.  *See* Dkt. No. 138.

At the January 9, 2015 hearing, Defendants submitted that converting from one format to the same format would not be "converting" at all.  Defendants also reiterated that the specification and the figures describe converting that occurs only if the original format is not usable.

Plaintiff responded that there may be multiple usable formats and that the claim does not specify whether the original format is usable or not.  Plaintiff also urged the conversion could be from one format to another format within the same "family" of formats, for example, from an uncompressed JPEG format to a compressed JPEG format.

<u>(2)  Analysis</u>

Claims 53 and 54 of the '759 Patent recite (emphasis added):

53.  A programmable memory having stored thereon a plurality of sequences of instructions including sequences of instructions which, when executed by one or more processors cause one or more electronic devices to:
      receive a video file in a native playback format;
      *convert the video file to a native playback format usable by a playback device*; and
      allow a user to download the video file to a playback device for subsequent use at a time specified by the user.

54.  The programmable memory of claim 53 wherein the plurality of sequences of instructions further comprise instructions which, when executed by one or more processors cause one or more electronic devices to *determine at least one native playback format compatible with the playback device*.

Plaintiff argues claim differentiation with respect to Claim 54, arguing that Claim 53 "need not encompass such intelligent assessment of device capabilities, and comparison of those capabilities to the incoming format, at all.  Instead, Claim 53 also encompasses a 'non-intelligent' or 'hard-coded' system that simply converts every video file to a native playback format known to be usable by the receiving playback device, whether or not the incoming file is also usable by that device."  Dkt. No. 119 at 14.

Defendants respond that claim differentiation is inapplicable because "Claim 54 does not further limit the performance of this converting step.  Instead, claim 54 recites an additional step—not found in claim 53—that requires the electronic device to 'determine at least one native playback format compatible with the playback device.'"  Dkt. No. 131 at 19.

On balance, even if the doctrine of claim differentiation is not strictly applicable here, the "determin[ing]" limitation added by Claim 54 nonetheless suggests that Claim 53 is indifferent as to whether the video file, as received, is usable by the playback device.  *See Phillips*, 415 F.3d

at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

As for the specification, on one hand the specification discloses that conversion could occur only if a file is incompatible with a device:

> In operation, a user selects a piece of information from a source such as a computer disk drive, the Internet, or a remote database using the first communications link. The programming apparatus may download this information and compare its format with that required by the programmable device to determine format compatibility. *If the two formats are compatible*, the programming apparatus may download the selected information into the programmable device. *If the formats are not compatible*, the programming apparatus may convert the downloaded file to a format compatible with that required by the programmable electronic device.

'651 Patent at 2:19-30 (emphasis added); *see id.* at 3:50-54, 4:45-58 & 10:64-11:5 (similar).

On the other hand, the specification indicates that a file could be converted to a requested format without regard to compatibility between the device and the original, unconverted file:

> For example, a user may access an Internet site or remote computer using communications network 95 and enter a title or description of the desired audio or video information along with format requirements. The remote computer or Internet site may then search the Internet or other databases to find a file that matches the user's description. Once this file is found, the Internet site or remote computer may *convert that file to the requested format*, (using a system similar to the [*sic*, that] described above) and provide it to device 20 via computer 90 and/or link 33.

*Id.* at 7:15-24 (emphasis added).

As for the prosecution history, Defendants cite the following statements by the patentee:

> One aspect of applicant's claimed invention is concerned with a method for providing audio and/or video files to a wireless media device. The claimed method, as amended, specifies converting the format of a requested content file to a *native playback format* that is compatible with the wireless media device. Thus, for example, if the user's media device is configured to play MP3 files, and the user selects a content file from a content provider that is in WAV format, the present invention converts the WAV format file to another suitable *native playback format* (*e.g.*, such as MP3 format) *so the user may consume that content file on his or her media device*.

Dkt. No. 131, Ex. F, May 22, 2008 Reply to Office Action at 13-14 (SCRN00003108) (emphasis added).

> Applicant points out that the system of Galensky [(United States Patent No. 6,845,398)] will allow a user to download a file to player 10 that has an incompatible file format (*e.g.*, such as a WAV file) on which playback can be attempted. However, absent the proper CODEC or other playback software, such a file will not play properly on portable device 10. This [is] a common problem experienced by end users, *which applicant's claimed invention addresses*.

*Id.*, Ex. X, Dec. 28, 2007 Reply to Office Action at 9 (emphasis added).

Nothing in these passages, however, amounts to a definitive statement that what is converted must be a file that is not usable by the playback device. *See Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added); *id.* at 1325-26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both *clear and unmistakable*.") (emphasis added).

Finally, although Defendants have noted that Plaintiff has agreed to construe certain terms in the '651 Patent as referring to a format that is "not compatible" (*see* App'x A, below), the claims of the '651 Patent are distinguishable from Claim 53 of the '759 Patent. For example, Claim 1 of the '651 Patent recites (with emphasis added) "determining a format of the selected video file," "comparing . . . the video file format requirements of the second wireless communications device with the format of the selected video file," and "*in response to said comparison*, converting . . . ." Claim 53 of the '759 Patent, by contrast, contains no such determination or comparison, let alone converting "in response to" a comparison.

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"convert the video file to a native playback format usable by a playback device"** to have its **plain meaning**.

## C. "native playback format"

| "format" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "the arrangement of data within a file" | "an encoding standard that specifies the arrangement of data within a file" |
| **"native playback format"** | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a format supported by a device for playback of audio or video" | "a format requiring the proper CODEC[3] or other playback software to play properly" |

Dkt. No. 142, Ex. A at 4 (square brackets omitted). The parties submit that this term appears in Claims 53, 54, 56, and 65 of the '759 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with its preliminary construction that "format" means "the arrangement of data within a file" and "native playback format" means "a format supported by a device for playback of audio or video."

---

[3] "CODEC" refers to "coder-decoder." Dkt. No. 119 at 17.

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[b]oth 'format' and 'native playback format' have well-understood meanings in the art," and "[n]othing in the intrinsic evidence supports a departure from those meanings to require an 'encoding standard' or a 'CODEC or other playback software' (as Defendants propose)."  Dkt. No. 119 at 15-16.

Defendants respond that "native playback format" "does not have a 'well-understood' meaning," "is not recited in any of [Plaintiff's] extrinsic evidence," "is not recited in any other issued Uned [sic] States patent available at the PTO website," and "is not used at all in the patent specification" but instead was introduced during prosecution to overcome prior art.  Dkt. No. 131 at 19.  Defendants submit that "[t]he prosecution history—the only source that describes 'native playback format'—repeatedly explains that the presence of a CODEC is what determines whether a file is compatible or usable."  *Id.* at 20.

Plaintiff's reply brief does not address this term.  *See* Dkt. No. 138.

At the January 9, 2015 hearing, Plaintiff argued that although a CODEC or other appropriate software may be necessary for playback, that is not a limitation of the "format" or "native playback format" itself.  Plaintiff also emphasized that Defendants have not rebutted the opinion of Plaintiff's expert that "AVI," which the specification discloses as an example of a "format" (as quoted below), is *not* an encoding format.

Defendants argued that merely compressing data is not a change in "format" because "format" refers to a "platform."  Defendants suggested that in their proposed construction, the word "platform" could be substituted for "encoding standard."

Plaintiff replied that the word "platform" is unclear and would introduce further ambiguity.

The parties also discussed Claims 25, 26, and 28 of the '759 Patent, which recite "WAV" as being an "uncompressed native playback format" and "MPEG" as being a "compressed native playback format."

(2) Analysis

Claim 53 of the '759 Patent recites (emphasis added):

53. A programmable memory having stored thereon a plurality of sequences of instructions including sequences of instructions which, when executed by one or more processors cause one or more electronic devices to:
    receive a video file in a *native playback format*;
    convert the video file to a *native playback format* usable by a playback device; and
    allow a user to download the video file to a playback device for subsequent use at a time specified by the user.

The specification discloses:

Programmer 30 may also communicate with device 20 to determine which *format* the incoming information should be converted to so that the information is compatible with the downloading requirements of device 20. For audio files, this may include, but is not limited to, converting to or from any of the following *format* types: analog; MIDI; MPEG; PCM; Windows Media Audio Code (WMA); WAV; or Adaptive Transform Acoustic Coding (ATRAC), or to or from any other suitable audio format, etc. For video files, this may include, but is not limited to, converting to or from any of the following *format* types: analog; JPEG; MPEG; GIF; AVI, or to or from any other suitable video format, etc. Text files may include, for example, HTML files, Wireless Markup Language (WML) files, WordPerfect[TM] files, Microsoft Office[TM] files, or any other suitable text files.

'651 Patent at 3:63-4:10 (emphasis added).

Plaintiff submits that the disclosure of "AVI" as a "format" is particularly probative because "as one of skill in the art would recognize, AVI does not specify any 'encoding standard' at all." Dkt. No. 119 at 16 (citing Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 30 ("The AVI format is a 'container format': while it describes how data is arranged within the file, it does not specify any encoding format.")).

As for the prosecution history, the parties have cited the following statements by the patentee:

> [E]ven if the system of Fritsch allowed a user to download a content file with an incompatible file *format* to a portable playback device (*e.g.*, such as a WAV file), absent the proper *CODEC*, such a file will not play properly (or at all) on that portable playback device. This [is] a common frustrating problem experienced by end users, which applicant's claimed invention addresses.

Dkt. No. 119, Ex. 16, Aug. 21, 2009 Reply to Office Action ('759 Patent File History) at 18-19 (SCRN00003036-37) (emphasis modified).

> One aspect of applicant's claimed invention is concerned with a method for providing audio and/or video files to a wireless media device. The claimed method, as amended, specifies converting the *format* of a requested content file to a *native playback format that is compatible with the wireless media device*. Thus, for example, if the user's media device is configured to play MP3 files, and the user selects a content file from a content provider that is in WAV format, the present invention converts the WAV format file to another suitable *native playback format* (*e.g.*, such as MP3 format) *so the user may consume that content file on his or her media device*.
>
> * * *
>
> Another benefit of the claimed invention is that conversion routines can be updated to interoperate with an ever-changing end user market (*e.g.*, changing mobile playback platforms) which have evolving software, firmware, *CODECS* or other changing playback configurations.
>
> * * *
>
> Applicant points out that the system of Galensky will allow a user to download a file to player 10 that has an incompatible file *format* (*e.g.*, such as a WAV file) on which playback can be attempted. However, absent the proper *CODEC* or other playback software, such a file will not play properly or at all on portable device 10. This [is] a common frustrating problem experienced by end users, which applicant's claimed invention addresses.

Dkt. No. 131, Ex. F, May 22, 2008 Reply to Office Action at 13-14 & 16 (SCRN00003108-09 & SCRN00003111) (emphasis added); *see also id.*, Ex. D, Aug. 21, 2009 Reply to Office Action at 15-16 & 18-19 (SCRN00003033-34 & SCRN00003036-37) (similar).

On balance, nothing in the prosecution history identified by the parties warrants finding any disclaimer or lexicography or otherwise warrants limiting the seemingly generic terms "format" and "native playback format." *See Omega Eng'g*, 334 F.3d at 1324. Instead, this prosecution history confirms that the playback format can be said to be "native" for a particular device if it is supported by that device.

As to extrinsic evidence, Plaintiff has cited various technical and non-technical dictionaries that define "format" as an arrangement, structure, or organization of information or data. *See* Dkt. No. 119 at Exs. 7, 8 & 11-15. On one hand, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321. On the other hand, these definitions are consistent with the apparent generic usage of the term "format" in the specification, as quoted above. *See id.* at 1322 (noting that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words" and that "[a] dictionary definition has the value of being an unbiased source").

The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"format"** | **"the arrangement of data within a file"** |
| **"native playback format"** | **"a format supported by a device for playback of audio or video"** |

**A. "link that identifies the converted file"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>    "an element that identifies the converted file" | "identification of converted file already located on second wireless device" |

Dkt. No. 142, Ex. A at 6. The parties submit that this term appears in Claim 40 of the '651 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "link that identifies the converted file": "Plain meaning (Expressly reject Defendants' proposal of requiring a file 'already located on [a] second wireless device'[)]."

(1) The Parties' Positions

Plaintiff argues that "'[l]ink that identifies the converted file' refers to an ordinary Internet hyperlink or Uniform Resource Locator ('URL')" and "Defendants' attempt to limit this term to apply only to identification of a file 'already located on second wireless device' is contrary to the claim language, the specification, and the understanding of one of skill in the art." Dkt. No. 119 at 18. Plaintiff submits that "[t]he case where a media file is already located on the receiving device is addressed only in a single exemplary embodiment," and "embodiments where an 'indicia' is sent . . . are separately claimed by claims 30 and 39." *Id.* Plaintiff concludes that "[g]iven the pervasive discussion throughout the specification of Internet browsing, selection, and downloading, one of ordinary skill in the art would understand 'sending a link that identifies the converted file' to refer to sending a hyperlink or URL that identifies a file accessible on the

Internet (or elsewhere) and would not limit this term to files already located on the second wireless device as Defendants contend." *Id.* at 19.

Defendants respond that this disputed term should be construed consistent with the sole relevant embodiment. Dkt. No. 131 at 22 (citing '651 Patent at 12:13-18). Defendants also argue that Plaintiff's proposal of "changing the word 'link' to 'element' does not help the jury understand the limitation and injects more ambiguity into the construction" and "is even broader than the claim term 'link' and should be rejected as contrary to the plain meaning of the claim." Dkt. No. 131 at 22.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 138.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

(2) Analysis

Claim 40 of the '651 Patent depends from Claim 1. Claims 1 and 40 recite (emphasis added):

> 1. A method of format converting a video file received from a first wireless communications device for communication to a second wireless communications device, the method comprising:
> receiving from a first wireless communications device at least one video file selected by a user of the first wireless communications device for transmission to a second wireless communications device having video playing capability;
> determining a format of the selected video file;
> determining from information associated with the second wireless communications device video file format requirements of the second wireless communications device;
> comparing, with one or more computer processors, the video file format requirements of the second wireless communications device with the format of the selected video file;
> in response to said comparison, converting with one or more computer processors, the format of the selected video file to a format that is compatible with the video file format requirements of the second wireless communications device; and

sending the converted video file to the second wireless communications device.

\* \* \*

40. The method of claim 1, wherein sending the converted file to the second wireless communications device, comprises sending *a link that identifies the converted file*.

The specification discloses that information may be stored in a "receiver's device":

[I]f computer 90 determines at step 156 that the signature file is located in the receiver's device 20, computer 90 may transmit an indicia indicative of the selected file to the receiver[']s device 20 along with the outgoing call at step 178 (FIG. 12). Next, the receiver's device 20 may associate a signature file that corresponds to the indicia, replace its ring sequence with that signature file, and play that signature file at step 180. At step 182, the receiver's ring sequence may be returned to its original setting and the program may exit. It is assumed for the purposes of this illustration that signatures [*sic*] files stored in the receiver's device 20 are already in a suitable format. However, if this is not the case, a conversion step may be added between step 178 and step 180 (not shown).

'651 Patent at 12:13-25.

The specification also discloses, however, that information can be obtained through the Internet. *See* '651 Patent at 2:19-22, 6:19-46 & 6:65-12.

On balance, Defendants have failed to adequately justify their proposal that the converted file must be already located on the second wireless device. Defendants' proposed construction is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"link that identifies the converted file"** to have its **plain meaning**.

DISPUTED TERMS IN U.S. PATENT NO. 6,496,692

## A. "user-defined audio file"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>    "user-selected audio file" | "an audio file provided by the user" |

Dkt. No. 142, Ex. A at 5-6. The parties submit that this term appears in Claims 1, 4, and 5 of the '692 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "user-defined audio file": "an audio file provided by the user."

(1) The Parties' Positions

Plaintiff argues that "the specification explicitly uses the term 'user-defined audio' in connection with a user choosing or selecting an audio file." Dkt. No. 119 at 19.

Defendants respond that "a user may 'select' an audio file from the predefined group, but that 'selected' audio file is *not* 'user-defined.'" Dkt. No. 131 at 23. Defendants submit that "while claim 1 is directed to the 'user-defined' embodiment, claim 7 is directed to the 'predefined' embodiment." *Id.* Defendants also urge that Plaintiff's proposed construction would render the term "user-defined" superfluous in, for example, Claim 1 of the '692 Patent, which recites: "allowing a user to *choose* the *user-defined* audio file from among the browsed audio files." *Id.* at 24 (emphasis Defendants'). Finally, Defendants argue that "the patent never equates 'user-defined' with 'user-selected.'" *Id.*

Plaintiff replies, as to Claims 1 and 4 of the '692 Patent, that "Defendants offer no explanation for how a user could provide an audio file to choose from among other audio files if

the user is browsing a plurality of different locations, including the Internet." Dkt. No. 138 at 8-9.

At the January 9, 2015 hearing, Plaintiff submitted that although its proposal perhaps renders the word "choose" in Claim 1 somewhat redundant, some redundancy in claim language is permissible. Defendants responded that whereas "predefined" refers to a database that cannot be modified by a user, "user-defined" refers to a database of files compiled by a user in advance of the user choosing a file. Plaintiff replied that Defendants' argument is inconsistent with, for example, dependent Claim 4, which recites "retrieving the user-defined audio file from the Internet" rather than from a user library.

<u>(2) Analysis</u>

Claims 1, 4, and 5 of the '692 Patent recite (emphasis added):

1. A method for programming a *user-defined audio file* into a telephone comprising:
  allowing a user to search a plurality of different locations that include audio files;
  allowing the user to browse audio files in one of the plurality of different locations that include audio files;
  allowing the user to choose the *user-defined audio file* from among the browsed audio files; and
  enabling the user of the telephone to program at least a portion of the *user-defined audio file* into the telephone for use as an indicia of an incoming communication.

* * *

4. The method of claim 1 wherein the enabling further comprises retrieving the *user-defined audio file* from the Internet.

5. The method of claim 1 wherein the enabling further comprises transmitting the *user-defined audio file* across a wireless network.

The specification discloses "select[ing]" as well as "choosing":

In operation, a user *selects* a piece of information from a source such as a computer disk drive, the Internet, or a remote database using the first communications link.

* * *

This feature allows a user to *select* and send a signature file to the person receiving the telephone call such that the person receiving the call is alerted by that file.

* * *

Although not shown in FIG. 2, programmer 30 preferably has a display screen and a data input device, such as a keyboard associated with it so that a user may, among other things, browse and *select* files, monitor file transfers, and ensure that device 20 has properly received the *selected* files.

* * *

With this configuration, a user of device 20 may access Internet 80 and *select* information for downloading into device 20.

'692 Patent at 1:66-2:2, 2:17-20, 4:43-48 & 6:5-7 (emphasis added); *see id.* at 6:18-20 ("This allows a user to select information, such as audio and/or video, that is available on the Internet or on a remote network computer, and program that information into device 20.").

For example, if a user is placing a wireless telephone call or paging someone with device 20, he or she may *select* the signature feature in order to send user-defined audio or video along with, or prior to, that call. A user may accomplish this by browsing through a menu on device 20 that displays available signature options, and by *choosing* a particular file (not shown). If the user *chooses* an audio file, for example, device 20 may send that *selected* audio file when a call or page is placed (or a period of time before the call or page is placed).

*Id.* at 7:41-50 (emphasis added).

[A] user may connect telephone 500 to an external programmer 30 (not shown in FIG. 7) via link 32 to program *user-defined* audio or video in telephone 500 as described above. Processor 530 may route this information to alerting circuit 550 for storage and subsequent use. Afterwards, the user may configure telephone 500 to play a certain *user-defined* audio file stored in alerting circuit 550 when receiving an incoming call. Thus, when a call is received, processor 530 may instruct altering circuit 550 to play the *selected* file through the speaker 540.

*Id.* at 10:2-11 (emphasis added).

Defendants have also cited the following disclosure:

> In yet another embodiment, a user, when placing a call, may invoke a menu on device 20, which displays a list of signature files available for the person being called. This list may be *defined* by the person receiving the call. For example, the person receiving the call may create a signature file list by *selecting* certain audio and/or video files and placing them in a database of a remote computer such as computer 90 by using, for example, a personal computer connected to the Internet. In some embodiments, signature files may also be stored in a device 20 of the person receiving the call. In this implementation, a list of signature file names may be stored in computer 90 so that a caller may browse the names of signature files stored in the device of the person receiving the call. Signature files may also be stored in a combination of both computer 90 and device 20.

'692 Patent at 8:6-20 (emphasis added).

In sum, the specification thus appears to use "selecting" and "choosing" interchangeably, but nowhere does the specification clearly equate "selected" or "chosen" with "defined."

Turning to the prosecution history, Defendants have cited the following statement by the patentee:

> Applicant's invention is concerned with locating and downloading *user-defined* audio and/or video information such as a digital audio file into a telephone or other device capable of providing person to person communications such as a cell phone or PDA. One purpose of the invention is to prevent users from being constrained by a limited *predefined list* of "static" (i.e., unchangeable) ring sequences or notes provided by a telephone manufacturer or other source.

Dkt. No. 131, Ex. CC, Jan. 25, 2002 Reply to Office Action ('692 Patent File History) at 11 (SCRN00001668) (emphasis modified); *see id.* at 16 (stating that "user-defined audio files" are "a central feature of the claimed invention").

This prosecution history demonstrates that the term "user-defined" distinguishes a "predefined" unchangeable list of content from "user-defined" content, which can be selected and configured by the user. Such a reading is consistent with the specification, which contrasts "user-defined audio" with "pre-programmed information (e.g., audio clips, video clips or frames,

etc.) placed there by the manufacturer." '692 Patent at 1:32-34. Such a reading is also supported by the contrast between Claim 1, which recites a "user-defined" audio file, and Claim 7, which recites "predefined" audio files. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

Defendants' proposed construction is thus appropriate, albeit with the understanding that Defendants' proposal of "provided by the user" means that the user must obtain or identify the content but does not necessarily mean that the user records the content, such as through a microphone. For example, content could be obtained from the Internet. *See* '692 Patent at Claim 4; *see also* Dkt. No. 131, Ex. CC, Jan. 25, 2002 Reply to Office Action ('692 Patent File History) at 12 (SCRN00001669) ("the user may choose a particular audio or video file from a certain source such as a DVD player or the Napster© website and download some or all of that file for use in his or her programmable device").

Finally, the Court hereby expressly rejects as unsupported Defendants' argument, presented at the January 9, 2015 hearing, that this disputed term requires a database, library, or list established by a user.

The Court accordingly hereby construes **"user-defined audio file"** to mean **"an audio file provided by the user."**

**B. "A method for programming a user defined audio file into a telephone"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. The preamble is not limiting. | The preamble is limiting. Plain and ordinary meaning. |

Dkt. No. 142, Ex. A at 6. The parties submit that this term appears in Claim 1 of the '692 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "A method for programming a user defined audio file into a telephone": "The preamble is not limiting."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "the preamble is not limiting because it provides mere prefatory language for the invention as a whole rather than essential structure or steps. Indeed, all the terms used in the preamble ('programming,' 'user-defined audio file,' 'telephone') are present in the body of the claim itself." Dkt. No. 119 at 21. "Finally," Plaintiff submits, "there is no prosecution history to suggest that the preamble was added to distinguish prior art." *Id.*

Defendants respond that "[t]he preamble of claim 1 of the '692 patent is limiting because it serves as antecedent basis for the phrase 'the user-defined audio file,' which appears in the third limitation of claim 1." Dkt. No. 131 at 24.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 138.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

<u>(2) Analysis</u>

In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*[*, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.,*

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (finding the preamble limiting because of "clear reliance by the patentee on the preamble to persuade the Patent Office

that the claimed invention is not anticipated by the prior art"); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

Here, Claim 1 of the '692 Patent recites (emphasis added):

> 1.   A method for programming *a user-defined audio file* into *a telephone* comprising:
>> allowing a user to search a plurality of different locations that include audio files;
>> allowing the user to browse audio files in one of the plurality of different locations that include audio files;
>> allowing the user to choose *the user-defined audio file* from among the browsed audio files; and
>> enabling the user of *the telephone* to program at least a portion of *the user-defined audio file* into *the telephone* for use as an indicia of an incoming communication.

In some circumstances, a preamble may be limiting where the patentee "cho[]se[] to use *both* the preamble and the body to define the subject matter of the claimed invention, [so] the invention so defined, and not some other, is the one the patent protects." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns*, 55 F.3d 615, 620 (Fed. Cir. 1995).

On balance, here the preamble is not limiting because the body of the claim recites a "structurally complete invention." *Catalina Mktg.*, 289 F.3d at 808; *see Aspex Eyewear*, 672 F.3d at 1347 ("[T]he preamble language in the . . . patent is not needed to give meaning to the claims, which recite structurally complete inventions without the preamble language.  And nothing in the prosecution history suggests that the preamble language was considered necessary to the patentability of the claims.  Under those circumstances, this court has found the preamble language not to be limiting.") (citations omitted).

The Court accordingly hereby finds that the preamble of Claim 1 of the '692 Patent is **not limiting**.

## TERMS THAT DEFENDANTS CONTEND ARE INDEFINITE

**A. "enhanced performance speaker" and "enhanced performance speaker capable of providing a substantially full range of audio sounds"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>   "a speaker that can provide a substantially full range of audio sounds" | Indefinite |

Dkt. No. 142, Ex. A at 6-7. The parties submit that these terms appear in Claims 22, 30, and 39 of the '395 Patent and Claim 10 of the '866 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "enhanced performance speaker" and "enhanced performance speaker capable of providing a substantially full range of audio sounds": "Not indefinite[;] [p]lain meaning."

(1) The Parties' Positions

Plaintiff argues that "[o]ne of ordinary skill in the art would understand that the claims themselves inform the meaning of 'enhanced performance speaker.'" Dkt. No. 119 at 21; *see id.* at 21-22 (citing Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶¶ 38-43 & 45).

Defendants respond that "[t]he term 'enhanced performance speaker' is purely subjective and therefore indefinite." Dkt. No. 131 at 25.

Plaintiff replies that "[i]n context, the claim makes clear the nature of the enhancement—it provides a substantially full range of audio tones." Dkt. No. 138 at 9.

At the January 9, 2015 hearing, Defendants reiterated that "enhanced" is a comparative term but is not recited in relation to anything in particular. Defendants also reiterated that "range" is unclear because that term could refer to, for example, any or all of frequency, pitch, or amplitude.

(2) Analysis

In general, "when faced with a purely subjective phrase . . ., a court must determine whether the patent's specification supplies some standard for measuring the scope of the phrase." *Datamize*, 417 F.3d at 1351, *abrogated on other grounds by Nautilus*, 134 S. Ct. 2120. The specification discloses:

> In some embodiments, speaker 540 may be an enhanced performance speaker (as compared to those currently installed in telephones) with a capacity for generating a full range of audio sounds.

'692 Patent at 10:35-39. Defendants argue that "[t]his statement is not limited to wireless phones, but also encompasses the myriad of wired, cordless, and wireless phones that were available in 1999, and, as such, fails to provide one of skill in the art with a clear point of reference, because there would be substantial variations across these phones and, more specifically, their speakers." Dkt. No. 131 at 27 (citing Dkt. No. 132, Dec. 11, 2014 Roads Decl. at ¶ 26).

During prosecution, the patentee further explained:

> [N]owhere in . . . any reference of record[] is the quality or fidelity of a ringtone mentioned or even recognized as a desirable or relevant feature. The use of high quality audio data such as polyphonic audio files for ringtones is an important feature of certain aspects of applicant's claimed invention. For example, the use of high fidelity ringtones such as polyphonic ringtones (sometimes referred to now as "real tones", "true tones", "master tones" etc.) that may be actual MP3 (or other high quality digital representations of) songs or other audio greatly improves the user's experience by *allowing the user to hear realistic recreations of selected audio*. Nowhere in [*sic*, is] this feature shown or suggested in the prior art of record. And in fact, the prior art systems of record are incapable of playing

such high quality audio because they lack the proper hardware (e.g., lack *appropriate speakers . . . .*

Dkt. No. 119, Ex. 10, May 4, 2007 Reply to Office Action ('866 Patent File History) at 17-18 (SCRN00002611-12) (emphasis added); *see id.* at 15 (SCRN00002609) ("The claimed enhanced performance speaker allows such high quality audio clips to accurately reproduce the high fidelity sound achievable with such clips, thus greatly improving the user's experience and satisfaction.").

Defendants respond that "much like the specification, the prosecution histories provide no guidance to one of ordinary skill in the art about what the alleged 'enhancement' may be out of the myriad of potential options." Dkt. No. 131 at 27 (citing Dkt. No. 132, Dec. 11, 2014 Roads Decl. at ¶ 32); *see Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (finding a proposed construction not sufficiently definite because of failure to "adequately distinguish . . . the invention from disclosed prior art").

As to extrinsic evidence, Defendants' expert, Dr. Curtis Roads, opines:

22. I also note that the term "enhanced" is an inherently imprecise and subjective term that is entirely dependent on the viewpoint of the particular user. Moreover, I have never heard the term in the context of loudspeaker technology. By analogy, what would be an "advanced performance automobile?" Such a description could mean many things and does not belong in a patent claim without more definite constraints or elaboration.

23. Different users may have different views as to whether a speaker is purportedly "enhanced" based on a wide variety of factors such as "tight bass," "punchiness," "clear soundstage," "lack of harshness," "detail," "high-end transparency," power handling, distortion levels, amplitude-versus-frequency response, spatial dispersion, physical size, efficiency, etc. Indeed, there is a precise science of *loudspeaker performance parameters*, the legacy of the Thiele and Small, who defined over 40 scientific criteria for evaluating speaker performance (Thiele 1971; Eminence 2014). Describing speaker performance by specifically enumerated objective performance parameters is widely accepted in the engineering community.

Dkt. No. 132, Dec. 11, 2014 Roads Decl. at ¶¶ 22-23.

Claim 22 of the '395 Patent is representative and recites (emphasis added):

22.  A wireless telephone that may be customized by searching for and selecting an audio file from a remote computer and programming the selected audio file into the wireless telephone for use as an indicia of an incoming communication, the telephone comprising:

a communications link capable of connecting to a database in the remote computer that includes a plurality of lists of audio files in MPEG, or WAV, or MP3 format or a combination thereof;

a display screen and a mobile Internet browser that allows a user of the wireless telephone to browse at least one of the lists of lists of [*sic*] audio files and view selectable audio files present in the browsed list;

processing circuitry configured to receive a selected one of the audio files from the communications link;

a programmable memory circuit for allowing the user to optionally store the selected audio file for use as an indicia of an incoming communication; and

an *enhanced performance speaker capable of providing a substantially full range of audio sounds* when one of the selected audio files is played as an indicia of an incoming communication.

On balance, the term "enhanced performance speaker" is defined in the claims in which it appears as being "capable of providing a substantially full range of audio sounds."  *See Trover Group, Inc. v. Tyco Int'l, Ltd.*, No. 2:13-CV-52, 2014 WL 3736340, at *9 (E.D. Tex. July 28, 2014) (Bryson, J.) ("Although the term 'amplitude' is used only in the claims and is not defined or discussed in the specification, the Court does not find it to be indefinite.  To the contrary, the context makes the meaning of the term sufficiently clear to ensure that the term is not so indefinite as to invalidate the claims in which it appears.").  The term "substantially full range of audio sounds" is a disputed term that is addressed separately below.  Finally, even assuming for the sake of argument that such a reading would improperly render the term "enhanced" superfluous, as Defendants have argued, such a finding would not be determinative because "surplusage may exist in some claims."  *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1312 n.6 (Fed. Cir. 2008); *accord ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010).

The Court therefore hereby expressly rejects Defendants' argument that these disputed terms render the claims indefinite. No further construction is required. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"enhanced performance speaker"** and **"enhanced performance speaker capable of providing a substantially full range of audio sounds"** to have their **plain meaning**.

## B. "substantially full range of audio sounds"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "the full range of sounds within human hearing, or a range of sounds not appreciably smaller than that range" | Indefinite |

Dkt. No. 142, Ex. A at 7. The parties submit that this term appears in Claims 22, 30, and 39 of the '395 Patent and Claim 10 of the '866 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "substantially full range of audio sounds": "Not indefinite[;] 'substantially the full range of sounds within human hearing.'"

(1) The Parties' Positions

Plaintiff argues that "[f]ollowing Federal Circuit precedent here, the term 'substantially' should be treated as an approximation . . . ." Dkt. No. 119 at 24. Also, Plaintiff argues, "[o]ne of ordinary skill would understand that the 395 and 866 Patents are directed to methods and systems that ultimately benefit humans; and thus, 'substantially full range of audio sounds' describes such range with respect to human hearing." *Id.* at 25. "However, the range of human hearing as described by scientists is not exact. . . . Furthermore, it is common sense that the range of hearing will vary from person to person." *Id.*

Defendants respond that "there are many different ranges in audio sound, including, but not limited to, dynamic range, frequency range, or pitch range. Neither the claims nor the specification provide guidance to one of skill in the art concerning which 'range' is being claimed." Dkt. No. 131 at 28 (citing Dkt. No. 132, Dec. 11, 2014 Roads Decl. at ¶ 29). Defendants submit that "the phrase 'the full range of sounds within human hearing' does not even appear in the patents' specifications." Dkt. No. 131 at 28. Moreover, Defendants argue, "the same speaker may sometimes infringe and sometimes not infringe depending on the individual listening to the speaker. This is prototypical indefiniteness." *Id.* Defendants conclude that "[b]ecause of the admitted, substantial variation in hearing across humans, the claims do not afford clear notice of what is claimed or when a speaker does or does not infringe." *Id.* at 29.

Plaintiff replies that "the range of human hearing, as included in [Plaintiff's] proposed construction, is the only benchmark discussed in the Patents." Dkt. No. 138 at 10. Plaintiff also submits that "[t]he claims in which 'substantially full range of audio sounds' appears are apparatus claims and are directed toward what the speaker is capable of producing—not what any one particular individual may hear." *Id.*

At the January 9, 2015 hearing, the parties argued this term together with the "enhanced performance speaker" terms addressed above.

(2) Analysis

Claim 22 of the '395 Patent recites, in relevant part (emphasis added): "an enhanced performance speaker capable of providing a *substantially full range of audio sounds* when one of the selected audio files is played as an indicia of an incoming communication."

The specification discloses:

For example, if a user is placing a wireless telephone call or paging someone with device 20, he or she may select the signature feature in order to send user-defined audio or video along with, or prior to, that call. * * * This audio file may temporarily replace the "ring sequence" of the device receiving the incoming call so that the person receiving the incoming call will be alerted by *hearing the audio file* sent by the caller.

'692 Patent at 7:41-54 (emphasis added).

Plaintiff's expert, Dr. Magione-Smith, concludes:

49.  One of ordinary skill would understand that the 395 and 866 Patents are directed to methods and systems for use by humans and thus "substantially full range of audio sounds" describes such range with respect to human hearing.  The range of human hearing is a well-known fact and is readily available with even cursory research. * * * [I]t is common knowledge that the limits in hearing vary among individuals.  Therefore, the term "substantially full range of audio sounds" is meant to encompass "the full range of sounds within human hearing, or a range of sounds not appreciably smaller than that range" which is as accurate as the English language can describe the variation of the human range of hearing.

Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶ 49.

One possible reading of the claim language and the above-quoted passage from the specification may be that the phrase "full range" refers to the full range of frequencies in the selected audio file.  *See, e.g.,* Dkt. No. 138, Ex. 24, Petition for *Inter Partes* Review at 15-16.

The specification as a whole, however, explains that an audio file used to replace the normal ringing sequence of a receiving device may be, for example, "an audio sample of a popular song."  '692 Patent at 3:31-32.  Because popular music is meant for human listening, and because the audio range of popular music can presumably be expected to span the range of human hearing, the intrinsic evidence is consistent with Plaintiff's proposed construction.  *See id.* at 7:50-54 ("This audio file may temporarily replace the 'ring sequence' of the device receiving the incoming call so that the *person* receiving the incoming call will be alerted by *hearing the audio file* sent by the caller.") (emphasis added).  Such a reading is consistent with the prosecution history.  *See, e.g.,* Dkt. No. 119, Ex. 10, May 4, 2007 Reply to Office Action ('866

Patent File History) at 15 (SCRN00002609) ("The claimed enhanced performance speaker allows such high quality audio clips to accurately reproduce the high fidelity sound achievable with such clips, thus greatly improving the user's experience and satisfaction.").

Further, although the word "substantially" is "a word of degree" that may be "imprecise," such terms are not necessarily indefinite. *Apple, Inc. v. Samsung Elecs. Co.*, 932 F. Supp. 2d 1076 (N.D. Cal. 2013) ("substantially centered" found not indefinite); *see Anchor Wall Sys, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) ("[W]ords of approximation, such as 'generally' and 'substantially,' are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter.") (citations and internal quotation marks omitted); *see also Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907-09 (Fed. Cir. 2005); *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("Expressions such as 'substantially' are used in patent documents when warranted by the nature of the invention, in order to accommodate the minor variations that may be appropriate to secure the invention.").

Finally, Defendants have cited *Halliburton*, arguing that variation in human hearing from person to person means that if the disputed term is interpreted with reference to human hearing, then the term necessarily renders the claims indefinite. 514 F.3d at 1255 ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite."). Nonetheless, extrinsic evidence supports Plaintiff's position that the typical range of human hearing is well-known and is taken into consideration by persons of skill in relevant arts. *See* Dkt. No. 119, Ex. 18, Francis Rumsey and Tim McCormick, *Sound*

*Recording: An Introduction* 2 (3d ed. 1997) (SCRN00010949) ("The human ear is capable of perceiving sounds with frequencies between approximately 20 Hz and 20 kHz . . . this is known as the *audio frequency range* or *audio spectrum*.").

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. As to the proper construction, "substantially" requires no construction, but Plaintiff's proposal is otherwise appropriate to clarify that the relevant range is the typical range of human hearing.

The Court accordingly hereby construes **"substantially full range of audio sounds"** to mean **"substantially the full range of sounds within human hearing."**

**C. "allowing," "to allow," and "that allows"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>    allowing: "permitting"<br>    to allow: "to permit"<br>    that allows: "that permits" | Indefinite |

Dkt. No. 142, Ex. A at 7. The parties submit that these terms appear in Claim 1 of the '692 Patent and Claims 11-13 of the '864 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "allowing," "to allow," and "that allows": "Not indefinite[;] [p]lain meaning."

<u>(1) The Parties' Positions</u>

Plaintiff submits that Defendants themselves use the term "allow" in their proposed construction for the term "allow a user to download the video file" (addressed above). Dkt. No. 119 at 26. Plaintiff also explains that "a computer system 'allows' a user to search and

download files when that computer is programmed with applications that perform those functions when used." *Id.* at 27.

Defendants respond that "[t]he problem with the 'allows the user to [perform a function]' terms is that they recite independent action by '*a user*' and do not provide any guidance or bounds as to what the actions are of an *accused infringer* that meet that claim limitation—the epitome of indefiniteness." Dkt. No. 131 at 29. Defendants explain that under Plaintiff's interpretation that "allowing" means "permitting," "this step is met by any entity that does not affirmatively act to stop 'a user' from independently performing some action." *Id.* at 29-30.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 138.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

(2) Analysis

Claim 1 of the '692 Patent recites (emphasis added):

1. A method for programming a user-defined audio file into a telephone comprising:
   *allowing* a user to search a plurality of different locations that include audio files;
   *allowing* the user to browse audio files in one of the plurality of different locations that include audio files;
   *allowing* the user to choose the user-defined audio file from among the browsed audio files; and
   enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication.

Claims 11-13 of the '864 Patent recite (emphasis added):

11. A method for providing a polyphonic audio file to a wireless telephone for use as an indicia of an incoming communication, the method comprising:
   providing a database of polyphonic audio files suitable for downloading to the wireless telephone;
   providing a list of polyphonic audio files in the database to a user of the wireless telephone when the user requests the list of polyphonic audio files;

*allowing* the user of the wireless telephone to browse the list of polyphonic audio files;

*allowing* the user of the wireless telephone to select a desired polyphonic audio file from the list of polyphonic audio files;

*allowing* the user of the wireless telephone to optionally download a selected polyphonic audio file into the wireless telephone for future use as an indicia of an incoming communication; and

confirming the selected polyphonic audio file has been properly received.

12. The method of claim 11 further comprising *allowing* the user of the wireless telephone to search the database of polyphonic audio files for a certain polyphonic audio file using title or description information.

13. The method of claim 11 further comprising *allowing* the user of the wireless telephone to review the selected polyphonic audio file before downloading the selected polyphonic audio file into a programmable memory in the wireless telephone.

The specification discloses:

There are many types of electronic devices available to consumers today that have the *ability* to produce both audio sounds and video displays. Many of these devices *provide users with the ability* to select and play a particular piece of audio or video. * * *

Currently, however, there are many electronic products that offer an audio/video playing capability that are not fully *user-programmable*. Users of such devices (e.g., wireless or cordless telephones, pagers, personal digital assistants (PDAs), hand-held computers and the like) have to choose from a limited selection of pre-programmed information (e.g., audio clips, video clips or frames, etc.) placed there by the manufacturer. This severely limits the *user's ability to customize* the device to suit his or her particular taste.

'692 Patent at 1:15-35 (emphasis added).

As to extrinsic evidence, Plaintiff has cited dictionary definitions of "allow" as meaning "permit to do something." Dkt. No. 119, Ex. 13, *The Concise Oxford Dictionary* 36 (10th ed. 1999) (SCRN00010900); *accord id.*, Ex. 15, *Oxford English Reference Dictionary* 36 (revised 2d ed. 2002) (SCRN00010892); *id.*, Ex. 17, *Webster's New Collegiate Dictionary* 31 (1973) (SCRN00010916).

Further, Plaintiff's expert opines:

56. For example, a computer system "allows" a user to search and download files when that computer is programmed with applications that perform those functions when executed. In other words and as an example, a computer system that allows a user to search is one that presents a user interface and logic for searching. A computer system that presented no search facility would be one that does not "allow a user to search" in accordance with the claim.

57. The inventions of the Asserted Patents include computer systems programmed to make it possible for users to perform certain actions, but do not require that users to [*sic*] perform certain actions. * * *

Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶¶ 56-57.

On balance, the above-discussed intrinsic and extrinsic evidence demonstrates that "allowing" refers to providing a capability. That meaning is already apparent from the context of the claims and the plain meaning of the disputed terms.

Defendants' indefiniteness argument is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"allowing," "to allow,"** and **"that allows"** to have their **plain meaning**.

**D. "enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning. If construction is necessary, then:<br>    "permitting the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication" | Indefinite |

Dkt. No. 142, Ex. A at 7. The parties submit that this term appears in Claim 1 of the '692 Patent. *Id.*

Shortly before the start of the January 9, 2015 hearing, the Court provided the parties with the following preliminary construction for "enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication": "Not indefinite[;] [p]lain meaning."

(1) The Parties' Positions

Plaintiff argues that "'[e]nabling' is a common term, understandable by both skilled artisans and a lay jury alike," and "[i]f it is to be construed, contemporaneous dictionaries confirm that this term should not be given any special meaning beyond 'permitting the user . . . .'" Dkt. No. 119 at 30.

Defendants argue this disputed term together with the "allowing" terms addressed above, and Defendants submit that "[t]here is no identification of what the accused infringer does to 'enable' the independent action of the 'user.'" Dkt. No. 131 at 30.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 138.

At the January 9, 2015 hearing, the parties presented no oral argument as to this term and instead rested on their briefing.

(2) Analysis

Claim 1 of the '692 Patent recites (emphasis added):

1. A method for programming a user-defined audio file into a telephone comprising:
    allowing a user to search a plurality of different locations that include audio files;
    allowing the user to browse audio files in one of the plurality of different locations that include audio files;
    allowing the user to choose the user-defined audio file from among the browsed audio files; and
    *enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication.*

For the same reasons set forth above as to the "allowing" terms, Defendants' indefiniteness argument is hereby expressly rejected. *See* '692 Patent at 6:50-7:11; *see also* Dkt. No. 119, Ex. 15, *Oxford English Reference Dictionary* 462 (revised 2d ed. 2002) (SCRN00010895) (defining "enable" as to "give . . . the means or authority to do something" or to "make possible"); *id.*, Ex. 17, *Webster's New Collegiate Dictionary* 374 (1973) (SCRN00010919) ("to provide with the means or opportunity" or "to make possible, practical, or easy"); Dkt. No. 120, Nov. 21, 2014 Mangione-Smith Decl. at ¶¶ 62-66.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"enabling the user of the telephone to program at least a portion of the user-defined audio file into the telephone for use as an indicia of an incoming communication"** to have its **plain meaning**.

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 4th day of March, 2015.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

| Term | Parties' Agreement |
|---|---|
| "converting with one or more computer processors, the format of the selected video file to a format that is compatible with the video file format requirements of the second wireless communications device"<br><br>"convert the format of the selected video file to a format that is compatible with the video file format requirements of the second wireless communications device"<br><br>"converting with one or more computer processors, the format of the selected video file to a format that is compatible with the video file format requirements of the second computing device"<br><br>('651 Patent, Claims 1, 12, 41) | Claims 1 and 41:<br>　　"converting the video file from a format that is not compatible with the video file format requirements of the second wireless device to a format that is compatible with the video file format requirements of the second wireless device"<br><br>Claim 12:<br>　　"convert the video file from a format that is not compatible with the video file format requirements of the second wireless device to a format that is compatible with the video file format requirements of the second wireless device" |
| "the native playback format"<br><br>('759 Patent, Claim 56) | "the 'incoming' native playback format, prior to any conversion by the programming executed by the claimed electronic device" |

Dkt. No. 142, Ex. A at 2-3.